IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PARIS WINTERS, <br><br> Plaintiff, <br><br> v. <br><br> SOO LINE RAILROAD d/b/a CANADIAN PACIFIC RAILWAY, <br><br> Defendant. | Case No. 21-cv-4702 <br><br> Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Paris Winters brings this action against his employer Canadian Pacific Railway for discrimination, harassment, and retaliation on account of his race and age in violation of 42 U.S.C. § 2000(e) *et seq.*, Title VII of the Civil Rights Act of 1964. Defendant Canadian Pacific (CP) has moved for summary judgement on all claims. For the reasons stated below, Defendant's motion for summary judgment [82] is granted.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts

1

are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

## BACKGROUND[1]

Canadian Pacific (CP) is a railroad company that provides freight rail transportation across the Midwest. DSOF ¶ 1. Plaintiff Paris Winters, an African American male, has worked at Canadian Pacific Railway since 1998. *Id*. ¶¶ 3, 13.

---

[1] These facts are taken from Plaintiff Winters' Rule 56.1 statements of fact [89] (PSOF), Defendants' statement of facts [83] (DSOF), Defendants' response to Plaintiff's statement of facts [94] (DRSOF), and Plaintiff's response to Defendants' statement of facts, [90] (PRSOF). The facts are undisputed unless otherwise noted.

2

Winters has held a number of positions at CP, including Laborer, Carman, and Carman Welder. *Id.* ¶ 13. From September 2014 to May 2020, Winters worked as a Foreman in CP's Mechanical Department in Bensenville, Illinois. *Id.* As a unionized employee, Winters' terms and conditions of employment with CP are governed by a CBA. *Id.* ¶ 4.

In June 2018, CP hired Corey Smith, who became Winters' manager and direct supervisor. *Id.* ¶ 16. Smith reported to Alexander Derek Gibson, the director of the Mechanical Department. *Id.* Smith and Gibson worked with each other prior to their time at CP; Gibson provided the initial referral for Smith to be hired as manager. PSOF ¶ 1. Above Gibson sat Bradley Robertson, CP Assistant Vice President, Mechanical Car. DSOF ¶ 37.

Winters' responsibilities as foreman included planning and tracking the position of locomotive and train cars in the rail yard. DSOF ¶ 14. Winters felt that Smith disrespected and singled him out because of his race and age, citing, for example, an October 18, 2019 conversation where Smith told Winters to repeat his instructions back to him. DRSOF ¶ 8. Winters also reported that Smith called him during his shifts more frequently than other managers did (a contention CP disputes). *Id.* ¶ 26. It is undisputed that Winters complained about Smith's conduct to CP Human Resources personnel on at least two occasions – to Erin Makaroff in June 2019 and to Amanda Cobb from January to April 2020 as part of a workplace assessment. DSROF ¶¶ 4, 8. The parties dispute whether Winters mentioned race discrimination in these complaints. *See id.*

Things came to a head on March 14, 2020. Around 2:25pm that day, Smith received word from a trainmaster that an incorrectly parked locomotive was blocking a train from leaving the yard as scheduled. DSOF ¶ 18. Smith immediately called Winters, who had been on duty since 6:00 a.m. *Id.* ¶¶ 19, 22. Winters acknowledged that he knew the locomotive was not parked on the correct track. *Id.* ¶ 21. Radio transmission confirms that Winters knew about the situation at least 25 minutes before Smith called him. *Id.* Winters, for his part, has a slightly different narrative of the events leading up to his call with Smith. He conferred with machinist Aric White to work on moving the locomotive to the correct track and believed that "the issue would be fixed quickly when Mr. Smith called him." PSOF ¶¶ 31-32. Another foreman, James Archer, later confirmed that "it took a couple minute to flip buttons" to unblock the train. *Id.* ¶ 34.

The parties dispute the nature of Winters and Smith's conversation: CP contends that Smith merely asked Winters questions, while Winters maintains that for more than five minutes, Smith berated him, yelled, and told him he "f'ed up the yard." PSROF ¶ 23. Ultimately, the parties agree that Winters responded, "I'm sick of this shit," and informed Smith that he was going home. *Id.*

Winters then left the worksite early (three and a half hours before his shift was over) and drove himself to an urgent care facility located in his hometown of Shorewood, Illinois. DSOF ¶¶ 24, 43. There, a nurse practitioner diagnosed Winters with acute sinusitis, sinus headache, and posterior rhinorrhea (postnasal drip). *Id.* ¶ 44. Winters sent a doctor's note to off-duty manager Pierre Hunter, who forwarded

4

the note to Smith at 5:39 p.m. the same day. PSROF ¶ 10. Smith also called Winters twice after he left the worksite, once on his work number and once on his personal cell, but Winters did not pick up the phone. DSOF ¶ 25. Winters did not return to work that day. *Id.* ¶ 51.

CP thereafter initiated a formal investigation, per the union CBA, into the events of March 14, 2020 and Winters' conduct. DSOF ¶ 26. On the morning of March 17, 2020, Winters spoke with Erin Makaroff from CP Human Resources and reported that he was "constantly harassed by and discriminated against by Corey Smith." PSOF ¶ 10.[2] The same day, CP sent Winters a "charge letter" informing him that he was under investigation for a) abandoning his work assignment, in violation of General Code of Operating Rules (GCOR) Rule 1.15 (Duty – Reporting or Absence), and b) violations of GCOR 1.6 (Conduct). DSOF ¶ 27; [83-4]. The letter also served as notice of a formal investigation hearing. *Id.* Winters only received notice of the investigation through his union steward because the letter was mailed to the wrong address. PSROF ¶ 27.

On May 11, 2020, Gibson presided over the investigation hearing, according to procedure prescribed by the CBA. DSOF ¶ 28. Although a union steward represented Winters at the hearing, Winters contends now that he was unable to call two witnesses. *Id.* ¶ 53. CP rebuts that Winters never provided these witnesses with notice to attend the hearing. *Id.* Winters, Smith, Archer, and Hunter all testified at

---

[2] CP disputes this fact as incredible, as Winters only disclosed this complaint to Makaroff in an affidavit submitted in response to CP's motion for summary judgment. [93] at 5-7. Winters also attaches an email he sent to Makaroff on April 17, 2020 seeking to follow up on his complaints about Smith "harassing [him] on 3/13/2020 and 3/14/2020." [89-1] at 9.

the hearing. *See* [83-15], Investigation Tr., 5/11/20. Thereafter, Gibson found that Winters violated both GCORs 1.6 and 1.15 and the Mechanical Availability Standard when: "(1) he told Smith that he was "sick of this shit;" (2) abandoned his assignment before the end of his shift without proper authority; (3) failed to maintain accurate records of the location of locomotives on the tracking sheet; and (4) misrepresented to Smith the facts related to the location of the crew." DSOF ¶ 31.

Gibson forwarded his findings to Robertson, who CP holds out as the final decisionmaker on Winters' discipline. Robertson testified in a deposition that he only reviews the "name of the employee, their identification, years of service, the charge, any disciplinary history and the recommendation presented to him" by the hearing officer to make a decision on discipline. PSROF ¶ 37. In his email to Robertson, Gibson (the hearing officer) recommended that CP impose a 20-day suspension. DSOF ¶ 36. Gibson later admitted in his deposition that he and Robertson also discussed disqualifying Winters from the Mechanical Foreman position. [89-5], Gibson Dep. 12/14/22, at 114:11-115:14. On May 21, 2020, Gibson sent a letter to Winters informing him that the formal investigation and hearing "substantiated" allegations against him; imposing the 20-day suspension; and demoting him from the Foreman position. DSOF ¶ 40. In June 2020, Winters resumed working in the Carman position he previously held. DSOF ¶ 42.

On June 3, 2020, Winters cross-filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and Illinois Department of Human

6

Rights. He received a right to sue letter on June 8, 2021. [1-2]. He filed this lawsuit on September 2, 2021. [1].

## ANALYSIS

Winters brings claims against CP for race and age discrimination in violation of Title VII of the Civil Rights Act of 1964, race-based harassment in violation of Title VII, and retaliation for exercising his rights under Title VII. [1]. CP moved for summary judgement on all claims. [82].

### I. Race Discrimination

Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Winters alleges a race discrimination claim under Title VII (Count III).

The parties both proceed under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 (1973). This approach requires the plaintiff to make a *prima facie* case of discrimination. If he does so, the burden shifts to the employer to offer a nondiscriminatory reason for the adverse employment action. If the employer does so, the burden then shifts back to the plaintiff to show that the employer's stated reason as a pretext.

To establish a prima facie case, Winters must show that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Illinois*

7

*Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). The parties agree that Winters is a member of a protected class, and CP does not challenge whether Winters experienced an adverse employment action. CP moves for summary judgment on the basis that Winters did not meet legitimate employment expectations, nor does he provide evidence that he was treated less favorably than a similarly-situated employee outside of his protected class. Winters asserts that CP did not apply its expectations fairly across employees, and so meted out disparate disciplinary measures. This gap, Winters argues, amounts to pretext, and serves as proof that non-Black employees received better treatment.

The Court finds that Winters presents enough evidence to create a genuine dispute of material fact over whether he met CP's legitimate employment expectations. It is undisputed that Winters did not feel well when he left his shift early on March 14, 2020, and forwarded a doctor's note that Smith eventually received later that day. DSOF ¶ 45; PSROF ¶ 31; Winters also vigorously disputes his handling of the incorrectly parked locomotive: he presents evidence that he updated the locomotive tracking sheet that day, was "thrown for a loop" by the incorrect parking, and that he communicated with a machinist to fix the problem before Smith called. PSROF ¶ 31; PSOF ¶¶ 28, 31.

Though Winters can satisfy the second prong of the prima facie test, he fails entirely to identify an adequate comparator. "Although they need not be identically positioned, 'similarly situated employees must be directly comparable to the plaintiff in all material respects.'" *Igasaki,* 988 F.3d at 948 (quoting *Patterson v. Indiana*

8

*Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009). Further "[t]he burden for showing he was not treated similarly is on the plaintiff." *Id.* This inquiry is meant to "eliminate confounding variables" and focus on the true issue: "discriminatory animus." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

In cases like this one, where the plaintiff alleges the employer disciplined him more harshly on account of race, "the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022). At the end of the day, the inquiry is meant to be "flexible, common-sense, and factual." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir 2012). "We are looking for comparators, not clones." *Id.* "If a district court determines that a plaintiff has failed to identify a similarly situated co-worker outside of her protected class . . . it need not address any of the underlying allegations of disparate treatment." *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329-30 (7th Cir. 2002).

Winters points to the following actions that CP used as the basis for his suspension and demotion: (1) swearing to a supervisor; (2) leaving a work assignment to go home sick; (3) failing to properly track locomotives; and (4) lying to a supervisor about the location of locomotives. Winters repeatedly argues that no other CP employee has been disciplined for such conduct. Yet he does not attempt to identify episodes involving specific individuals outside the protected class who acted similarly, relying instead on general assertions.[3]

---

[3] In its review of deposition testimony, the Court uncovered examples that Winters and Smith both offered of other CP employees who either swore at supervisors or hung up on them. [83-2], Winters

First, Winters contends that swearing was common at the Bensenville worksite. [88] at 6; PSOF ¶¶ 21-23. Gibson and Smith both testified that employees previously used swear words in conversation with them—Gibson recounted more than ten conversations with employees at CP in which a swear word was used. DSROF ¶ 22. Winters accordingly argues that CP disciplined him more harshly than other employees who swore on the job. This is not enough, however, for the Court to determine whether those other employees were similarly situated. Winters does not identify who else swore to their supervisors, or in what context (CP points out that Winters was cited specifically for directing a swear word towards a supervisor.) It may well be that Winters is the first CP employee to be disciplined for swearing at a supervisor. That fact alone, though, isn't enough to survive summary judgment. Winters fails to provide any concrete, specific evidence that another employee behaved in a similar way and received more lenient treatment by the same CP personnel. *Compare with Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010) (finding comparator was not similarly situated, even though she and plaintiff were both reported for swearing, because the complaint against comparator did not go up the same chain of command).

---

Dep. 12/8/22 at 235:20-23 ("[Smith] got cursed out and hung up on. And that was done by Chris Koutsios."); *id.* at 389:22-25 ("Kevin Yieling say all kinds of crazy things to Mr. Smith and said that he's taking FMLA and he's going home. That's leaving the job."); *id.* at 390:15-17 ("Danny Pelka has been known to do it all the time, and he -- and he'd say FMLA and go home."); [89-3] Corey Smith Dep. 12/12/22 at 58:18-25 (Smith recounting that Dan Rieder hung up on him in the past). But Winters does not mention this specific evidence in his response to CP's motion for summary judgment, nor does he develop the record enough for the Court to confirm that these employees had substantially similar interactions with their supervisors (involving, for example, both swearing and leaving shift in one episode).

10

As for the other conduct Winters was disciplined for, he bypasses the similarly situated inquiry altogether and focuses on whether he followed CP protocol to, for example, leave his work shift early, or to track locomotives on the rail yard. This is relevant information as to the second prong of the prima facie test that asks whether Winters met legitimate employment expectations. It does not, however, tell the Court whether other employees acted similarly.

Winters cites *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) and *Grayson v. O'Neill,* 308 F.3d 808 (7th Cir. 2002) for the proposition that in disparate discipline cases, the second and fourth prongs of the prima facie test merge. "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Id.* at 818. In those cases, however, the Seventh Circuit still required the respective plaintiffs to identify a comparator, and in fact, affirmed summary judgment for their failure to do so. That line of cases allows plaintiffs to make out a prima facie case of disparate discipline by first showing a comparator received more lenient discipline for similar behavior, *then* proceeding directly to the pretext analysis. The "merging" of the prongs does not run the other way. That is, Winters cannot only show that he met legitimate employment expectations and thereby satisfy the similarly situated prong. Winters thus fails to satisfy the elements of a prima facie case of race discrimination under Title VII.

11

Finally, in *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit held that when considering summary judgment motions for discrimination claims "courts must consider the evidence as a whole" to determine whether "a plaintiff presents evidence that permits a reasonable factfinder to conclude that the employer took an adverse action against the employee because of the employee's race or national origin." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). The Court finds that Winters' claims similarly fail under this standard.

Taking the evidence together, Winters has not presented direct or circumstantial evidence that his race caused his suspension and demotion. The Court GRANTS summary judgment to CP on the race discrimination claim.

## II. Retaliation under Title VII

CP also moves for summary judgment on Winters' Title VII retaliation claim (Count IV). Winters alleges that CP disciplined him because he reported race-based harassment and discrimination by Smith and Gibson to CP human resources representatives.

A *prima facie* case of retaliation under Title VII requires a plaintiff to show: "(1) he engaged in a statutorily protected activity, (2) [his] employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield,* 926 F.3d 894, 896 (7th Cir. 2019). CP again concedes that Winters suffered an adverse action, but otherwise argues that Winters did not engage in activity protected by Title VII, nor can he show that his complaints caused the adverse action.

12

Protected activity under Title VII includes "a formal or informal discrimination complaint to a supervisor." *Garza v. Wautoma Area Sch. Dist.*, 984 F.Supp.2d 932, 942 (E.D. Wis. 2013) (citing *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 674 (7th Cir. 2011)). A complaint of discrimination only qualifies as statutorily protected activity if it indicates discrimination based on a protected characteristic like race. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1152 (7th Cir. 2021).

Winters avers in an affidavit filed along with his summary judgment response that he reported race-based discrimination by Gibson and/or Smith on five distinct occasions: June 2019, October 2019, from January through April of 2020, and on March 17, 2020. [89-1] ¶¶ 6, 22. Of these, Winters' reports from January to April 2020 do not qualify as protected activity because they occurred in the context of a workplace assessment initiated by CP. Participation in an employer's internal investigation is not a "protected activity" under Title VII unless it occurs pursuant to a pending EEOC charge. *Hatmaker v. Memorial Medical Center*, 619 F.3d 731, 747 (7th Cir. 2010); *Cox v. Calumet Pub. Sch. Dist. 132*, 180 F.Supp.3d 556, 561 (N.D. Ill. 2016). Here, the CP assessment took place months before Winters filed his EEOC charge in June 2020. As for the other complaints, CP disputes whether Winters specified that his complaint pertained to race-based discrimination. [84] at 14. Winters' recollection is inconsistent in this regard: at one point, when asked if he "raised issues of harassment involving Corey Smith to Erin Makaroff. . . in the specific context of race or age," he responded that he did not as of June 2019. [83-2], Winters

13

Dep. at 264:15-20. Later, he stated that he did have a conversation with Makaroff about "how Mr. Smith was always harassing me, and I thought that it was race-based because he didn't do it to the Caucasian employees." *Id.* at 388:11-25. Though Winters contradicts himself, the Court will view the evidence in the light most favorable to him and assume that he complained of racial discrimination to Makaroff in June and October of 2019, as well as on March 17, 2020.[4]

Even with that assumption, though, Winters cannot show that CP's retaliation for the complaints was the "but for" cause of his suspension and disqualification. *McNutt v. Board of Trustees*, 141 F.3d 706, 709 (7th Cir. 1998). Key here is whether Winters' supervisors who made a final decision about his discipline knew that he complained on those occasions. The Court is willing to accept for the sake of summary judgment that Gibson was a final decisionmaker in this regard – Robertson acknowledged that he solely relied on the hearing officer's findings and recommendation in order to decide disciplinary measures. PSROF ¶ 37. Yet Winters has no evidence that Gibson knew about the complaints before presenting his findings to Robertson. When asked at his deposition whether he knew Winters lodged racial discrimination complaints, Gibson only referred to the "internal investigation that Ms. Cobb did." [89-5], Gibson Dep. at 133:17-23. He made no mention of Winters' complaints to Makaroff. "A supervisor simply cannot retaliate against an employee for engaging in the protected activity if the supervisor was not aware of the protected

---

[4] As the Court previously discussed, CP disputes Winters' account of his conversation with Makaroff on March 17, 2020. CP also disputes whether Winters reported in October 2019, as Winters disclosed this complaint for the first time in his affidavit. [89-1].

activity in the first place." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915-16 (7th Cir. 2022). Winters insists that at CP, "persons to whom complaints are made against are given notice and told who the person is that made the complaint." PSOF ¶ 5. But CP disputes that statement, and without more specific evidence, "it is not sufficient that a decisionmaker could have or even should have known about the employee's complaint." *Lesiv*, 39 F.4th at 915 (quoting *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512-13 (7th Cir. 2021).

There are other issues with causation. The June and October 2019 complaints are too far in time from the adverse action handed down months later in May 2020. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (describing other Seventh Circuit cases where two to four-month gap between protected activity and adverse action did not create an inference of suspicious timing). As for Winters' complaint on March 17, 2020, he avers that he called Makaroff at 8:00 a.m. that morning. PSOF ¶ 10. Yet he also attaches evidence to his Rule 56.1 statement that shows that Smith sent the charge letter to Gibson for his approval at 6:52 a.m. that morning, [89-3] at 15, weakening even more the connection between Winters' complaint and CP supervisors' motivation to discipline him. And where Winters contends that Gibson's disciplinary findings were so mistaken that they must have been retaliatory, this argument also fails. "[J]udgments regarding the fairness of a particular action or the accuracy of an employer's belief about an employee's job performance have no place in determining whether the employer acted based on an improper motive." *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017). What

15

matters is whether Winters' supervisors honestly believed that he violated CP rules when they made the decision to discipline him. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 576 (7th Cir. 2015).

The Court acknowledges that Winters makes some headway towards showing the rationale for the adverse action was pretextual. CP was not fully transparent in its charge letters about the specific rule clauses that would be addressed at the formal investigation. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937–38 (7th Cir. 2022) ("If an employer's explanation for the challenged employment decision has been shifting or inconsistent, this may be evidence of pretext."). Winters also heard rumblings from other employees that they were "setting him up" because Smith "wanted [him] out of the office." [83-2], Winters Dep. at 231:7-25. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (listing "ambiguous statements of animus" as relevant circumstantial evidence of retaliatory motive). Yet the Court cannot reach any of this evidence without first establishing that the decisionmakers knew what they were retaliating against. Winters does not have proof of either Gibson or Robertson's actual knowledge of protected activity. Therefore, no reasonable trier of fact could conclude that Winters has a viable retaliation claim. Summary judgement is GRANTED on this claim.

### III. Age Discrimination and Race Harassment

Lastly, CP moves for summary judgment on Winters' racial harassment (Count II) and age discrimination (Count I) claims. Winters does not respond to these arguments and therefore abandons the claims. *See Little v. Mitsubishi Motors North*

*Amer., Inc.*, 261 F. App'x 901, 903 (7th Cir. 2008) (plaintiff who "failed to present facts or develop any legal arguments" as to certain claims in response to motion for summary judgment deemed to have abandoned them); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (same). Summary judgment is GRANTED as to these claims.

## V. CONCLUSION

For the stated reasons, Defendant CP's motion for summary judgment is granted as to all claims. [82]. Civil case terminated.

E N T E R:

Dated: July 2, 2024

MARY M. ROWLAND
United States District Judge